ISAAC JACKSON v. JOHN JACKSON and JOSIAH HERITAGE, Executors of JOSEPH JACKSON, deceased.

The object of examining *a party* under oath, is to make a discovery of facts supposed to be within his knowledge, and of which the evidence cannot be otherwise attained.

In all matters of account in equity, it is the peculiar right of the party who seeks the account, to examine the accountant under oath, and thereby test his conscience as to facts and circumstances material to the investigation of truth and the ends of justice.

The mode of examination of a party in the English practice, is by written interrogatories, and there can be no cross-examination; but in New-Jersey the practice of oral examination, as well in relation to parties as witnesses, is universal; and the practice of cross-examination by counsel, it seems, is also universal. This practice approved by the court.

A party before a master cannot be cross-examined generally. He cannot make evidence for himself, by the introduction of facts or matters not the subject of inquiry on original examination. He can only be called on to explain, or to make such statements as may prevent misunderstanding, or rebut any unfair inference that may arise from the answer.

The errors of the master, in permitting the cross-examination of the party to be extended to improper matters, does not necessarily vitiate the whole report. If the same result is fairly attainable from a view of the evidence without the aid of the erroneous examination, the report will be confirmed.

It is improper for a master in his report to argue the case upon its merits. The province of the master is to report facts, and not arguments, for the information of the court.

THE master, having made his report in this cause, in pursuance of a decretal order, exceptions to the report were filed on the part of the complainant, and the cause came on for hearing upon the exceptions.

*Chapman* and *Williamson*, for complainant, in support of the exceptions.

*Armstrong* and *Wall*, for defendants.

[Jackson v. Jackson's Ex'rs.]

Cases cited by complainant's counsel. 1 *Paige*, 122; *Hopk.* 229; *Hoffman's Master in Ch.* 14, 20, 21; 2 *Fowl. Ex.* 294; 11 *Viner*, 433; 3 *P. W.* 251; 1 *Vesey*, 115; 2 *Vesey*, 865; 1 *Ball and B.* 180; 1 *John. Chan. R.* 527; 1 *Jac. and W.* 68; 2 *Vesey, sen.* 58; 6 *Halsted*, 151–5; 1 *Ball and B.* 25; 1 *Wash. Rep.* 248; 1 *Peters*, 309; 2 *Mad. R.* 125; 1 *Vesey*, 43.

THE CHANCELLOR. This case comes up on exceptions to a master's report, made in pursuance of an interlocutory decree, entered by consent of parties on the twentieth of January, one thousand eight hundred and thirty-one. A brief statement of the pleadings is necessary to a proper understanding of the questions that have been made.

The bill charges, that on the sixth of September, one thousand eight hundred and nine, Joseph Jackson made his last will and testament, duly executed according to law to pass real estate; and afterwards, to wit, on or about the twenty-first of September, one thousand eight hundred and ten, died in the city of Philadelphia.

By the will, the testator gave to his son John Jackson, one half the Shippen place, of seven hundred and twenty-seven acres. He directed his executors to make sale of the other half of it, invest the money, and pay the interest annually to his son Isaac Jackson, during his life, and after his death to pay the principal to his children. To his sons Thomas and Henry, he gave a plantation, and pecuniary legacies to his daughters, Edith, Mary and Hannah. The residue of his estate he ordered to be divided equally among all his sons and daughters.

After the death of the testator, the executors, John Jackson and Josiah Heritage, proved the will; and on the second of March, 1811, in pursuance of their powers, sold the one half of the Shippen place, in three different parcels, as follows:—

| To Daniel Seraw, | 152 | acres, for | $1120 15 |
|---|---|---|---|
| " Edward Carpenter, | 241 | " | 1269 37 |
| " Jeptha Abbott, | 5 | " | 85 75 |
| Making in the whole, | | - | $2475 27 |

[Jackson v. Jackson's Ex'rs.]

On the same second of March, one thousand eight hundred and eleven, David Seraw sold and conveyed the part he had purchased to John Jackson, one of the executors, for the same amount he agreed to give. The bill charges that this part was worth more money, and also that the executors have not put out to interest the proceeds of the said sale, as they ought to have done, but have applied them to their own use.

On the thirteenth of August, one thousand eight hundred and twelve, John Jackson sold to Isaac Jackson, the complainant, a tract of land for the sum of nine hundred dollars, and on the fourteenth of August the said Isaac Jackson gave to the executors a bond and warrant of attorney for the payment of nine hundred and forty dollars and eighty-three cents, in ten years, with interest, payable yearly, and also gave to them a mortgage to secure the payment of said bond. It was agreed, as the complainant states in his bill, that the interest of the trust money or fund in the hands of the executors, should be applied yearly to the extinguishment of the debt thus created.

On the first of March, one thousand eight hundred and fifteen, a settlement took place between the complainant and the defendants, concerning the moneys due from him to the executors, and from the executors to him; and upon such settlement, John Jackson entered on the bond which the executors held against him the sum of one hundred dollars and four cents, towards the principal of the said bond; and it is charged, that at the time of the settlement, the said John Jackson wrongfully retained and kept back from the complainant the sum of ten dollars, on account of his trouble and as commissions for himself and Josiah Heritage, as executors and trustees as aforesaid.

On the fifth of March, one thousand eight hundred and nineteen, a further settlement took place, and a balance of sixty-two dollars and seventy-four cents was credited on the principal of the bond. Similar settlements took place in the years 1821, 1822, 1823, and 1824; and at each time the balance of interest due the complainant on taking the account, was applied to extinguish the principal of the bond so given as aforesaid by the said Isaac

[Jackson v. Jackson's Ex'rs.]

Jackson to the said executors.   On the first of March, one thousand eight hundred and twenty-four, when the last settlement was made, there was justly due and owing to the defendants, (the executors,) one hundred and seventy-one dollars, or thereabouts, according to the settlement as then made; and the complainant alleges, that at each of these settlements, ten dollars were retained as commissions.

The bill then charges, that on the twenty-third of April, one thousand eight hundred and twenty-four, the executors, by virtue of the warrant of attorney, entered up a judgment on the bond so given as aforesaid by the complainant to the said executors, and at the same time made affidavit that the sum of nine hundred and ninety-six dollars and forty-eight cents was justly due to them on said bond; that an execution issued against the property of the complainant to make the said amount.   That the complainant then discovered the fraud that had been practised against him.   He discovered that the several sums or balances due to him on the several settlements, instead of being indorsed on his bond as so much principal paid, had been indorsed as so much money paid generally on the bond, and not as so much principal.

The bill prays, that the defendants may set forth what is now justly due to them on the said bond for principal and interest, and come to an account with the complainant for the interest money due and to grow due on the trust fund, and also on the said bond; that they may be ordered to pay over what upon such account may be found due, and then be removed from their office as trustees; and in the mean time be restrained from further proceeding on the execution.

Upon this bill an injunction issued.

The answer of the defendants states, among other things that it was agreed between the executors themselves, that John Jackson should take charge of and manage the money coming to Isaac and his children, and that Heritage should take charge of and manage the share or portion of Edith West.

John Jackson admits the sale of the land to Isaac Jackson and that he took a bond and mortgage payable to the executors

[Jackson v. Jackson's Ex'rs.]

The reason for so doing was, that he had so much more of the money of the estate than Heritage, his co-trustee, " and because so much money would thus be at interest under the will, of the amount of the Shippen place, ordered to be sold." He expressly denies, that any agreement whatever took place respecting the moneys due on said bond, at the settlement, being appropriated to the payment of the interest money due complainant under the will; and alleges, that at sundry times, he paid the complainant the interest money due him under the will, in full to the date of the payments, and took his receipts—the last of which receipts bears date in March, one thousand eight hundred and twenty-four. He also expressly denies, that any part of the principal money due on the said obligation was ever paid by the complainant to him the said John Jackson, or to the said Josiah Heritage, or any one else for his use; and both the defendants deny that they ever had with the complainant any settlement at any time of the amount due the said John Jackson upon the bond given by Isaac Jackson to the said executors, or any settlement of the amount due them jointly on said bond.

A replication was filed, and the case put at issue. On the twentieth of January, one thousand eight hundred and thirty-one, it was referred to one of the masters of the court, to inquire whether the defendants had put out to interest the money arising from the sale of half the Shippen place, and if so to whom, and when, and upon what securities; and where the same now is, and how secured; and how they have executed the trust; and how, and in what manner, and to whom, the said interest money has been paid; and to take and state an account between the parties in the cause generally, and particularly touching and concerning the said bond set forth in the bill; and report what payments have been made on the same, and whether the interest money arising from the said trust, or any part of it, has been applied to extinguish and satisfy the said bond, and what is now due thereon. And the master was directed to state an account touching the interest money arising out of the trust, and the payments of it, and to report any other special matter touching the

[Jackson v. Jackson's Ex'rs.]

said bond, or the said trust money, or the interest thereof, that might appear material to the cause.

In September, one thousand eight hundred and thirty-one, the master made report on all the matters referred to him, at large; and to this report various exceptions have been taken by the complainant.

The exceptions are of two characters. The first, second and third, relate to the mode of proceeding before the master; and the others affect more immediately the merits of the controversy. They will be considered in the order in which they were presented.

First, the complainant excepts, because the master, in taking the account, permitted the defendants to be examined as to matters not authorized by the decree; and especially, because he permitted the defendants' counsel to examine John Jackson as to the payment of the interest arising on the trust fund, that not being authorized by the decree.

The second exception is, that the master admitted illegal evidence to prove the payment of the interest on the trust fund.

The third exception is that the master, under the direction " to examine the defendants under oath or affirmation touching and concerning the putting out of the said trust money and the securities thereof; has considered the said defendants, when examined, as witnesses in the cause, and their examination as testimony in their own favor; which is contrary to the practice and principles of this court, which only considers the examination of parties under such an authority in a decree, as taken for the purposes of discovery."

These exceptions will be taken together. They lead to an inquiry of some importance in the practice of the court, viz. whether defendants who are examined by a master under the direction of the court, can in any case be cross-examined by the counsel of such defendants touching the matter to which they have been examined.

The object of examining a party under oath, is to elicit truth; to make a discovery of facts supposed to be within his knowledge,

and of which the evidence cannot be otherwise attained.   In all matters of account in this court, it is the peculiar right of the party who seeks the account, to examine the accountant under oath, and thereby test his conscience as to facts and circumstances material to the investigation of truth and the ends of justice.   The mode of examination differs, in different places, and hence has arisen the difficulty in the present case.   In the English chancery it is by written interrogatories, generally prepared and exhibited by the party seeking the examination, but settled by the master and considered as his act.   These interrogatories, thus settled, are served on the examinant, and he puts in his answer in writing, on advisement of counsel.   Full opportunity is given to consider of the interrogatories and the answers, and to give all proper explanations coming within the scope of the questions propounded.   Under this mode of proceeding, there can be no cross-examination.   Nor is it necessary or proper for the ascertainment of truth that there should be.   The party charged has no right to be a witness in his own behalf.   When examined by the adverse party, he is entitled to have the interrogatories before him, and time to answer advisedly and understandingly.   Whatever is in answer to the question, or fairly explanatory of the answer, he has a right to state, but nothing more.   If the answers, or any of them, are evasive or improper, exceptions may be taken, and the party be ordered to put in a sufficient answer.   In this way the whole truth is elicited.   Such is the English practice : *Cotton* v. *Harvey*, 12 *Ves.* 391 ; 1 *Newl. Prac.* 161 ; *Hoffman's Mast. in Chan.* 14—21 ; 1 *Hoffman's Prac.* 529, 533.

In New-York, the mode of examination has not been uniform. The first case to be found on the subject, is *Remsen* v. *Remsen*, 2 *John. Chan. R.* 495 ; in which the chancellor settles a variety of principles as to the mode of taking testimony, on an order of reference to a master.   He states the English mode to be by the exhibition of interrogatories duly settled ; and adds, that the practice in New-York, as he believes, has been more relaxed, and oral examinations have frequently, if not generally, prevailed ; but he gives no rule on the subject of cross-examination, where

the relaxed mode is resorted to and the interrogatories dispensed with. In the *Office and Duties of Masters in Chancery*, by *Hoffman*, it is stated that the practice under the old mode may easily be adapted to the oral examination. The case of *Armsby* v. *Wood*, in *Hopkins*, 229, does not bring up the point. There the defendant, having been examined as to certain points by the complainant, insisted that he might go on and testify to other and distinct matters in reference; and the right, though allowed by the master, was denied by the chancellor. It would seem, however, from the case as reported, that there was no cross-examination. The court, indeed, said, that the party examined might give any explanation applicable to the subject; but it seems to be implied, that these explanations should be given on the direct examination. In *Benson et al.* v. *Le Roy et al.* 1 *Paige*, 122, the present chancellor (Walworth) has established the practice in the state of New-York, that there can be no cross-examination by counsel. "The ancient practice, (says the court,) was, to file written interrogatories for the examination of a party, to which he put in his answer in writing. The modern practice of examining orally before the master, does not alter the rights of either party. The examinant may accompany his answer by any explanation fairly responsive to the interrogatory, which may be necessary to rebut any improper inference arising from the answer."

The practice of oral examination is universal in the state of New-Jersey, as well in relation to parties as witnesses, and I believe the practice of cross-examination by counsel is also universal. The strict rule now adopted in New-York, by analogy to the English rule, where the examination is by interrogatories, has not been adopted here; or, if it has been, the court is not aware of it, and the practice is not in accordance with it.

I do not feel willing, at this time, entirely to change the practice of the court; for if it would be right in other respects, I am not satisfied that it would tend to the advancement of justice. These examinations, according to our mode, are conducted, not by the master, but by the counsel of the party obtaining the

reference. He examines, to certain points, at his own discretion and in his own way, having previously prepared his course of interrogation. The answers are given immediately, and without opportunity for advisement; and if the counsel of the examinant had not the privilege of cross-examination, the result would be more likely to mislead than properly instruct the mind of the master. To obviate this, it is said, the party may always answer under the advice of counsel; and thus incorporate into his answers all explanations allowable in inquiries of this kind. This, it is apprehended, would lead to the habit of preparing written answers, and thereby create delay; and it is not perceived that greater benefit would eventually result from it, than from the present mode.

The ordinary course of these examinations, shows that the difference in principle between the examination of parties and witnesses, is not well understood, or not well attended to. When a party is before a master, he cannot be cross-examined generally. He cannot make evidence for himself, by the introduction of facts or matters not the subject of inquiry on the original examination. He can only be called on to explain, or to make such statements as may prevent misunderstanding, or rebut any unfair inference that may arise from the answer. Such is the correct practice of this court, though too frequently departed from. There is no difference in principle between this and the strict mode. The same result is sought to be attained, though in different ways; and the court has no difficulty in abiding by its own practice, as now explained and defined.

In the present case, the master erred in allowing the defendant to be cross-examined by his own counsel, as to matters to which he had not been interrogated by the complainant. It was not necessary by way of explanation, or to prevent any misunderstanding of the defendant's previous answers. Most of the cross-examination had reference to facts entirely separate and distinct; and as the answers of the examinant could not be evidence upon any principle, they should not have been received. The master erred, also, in allowing the cross-examination to ex-

[Jackson v. Jackson's Ex'rs.]

tend to matters not authorized to be examined into by the decretal order.   He had power, under the order, to examine witnesses under oath or affirmation, as to all the matters embraced in the decree ; but as regarded the defendants, his authority was to examine them " touching and concerning the putting out of the said trust money and the securities therefor," and nothing further.  Why, in taking the account, the order for examining the parties was so limited, the court cannot say.   The decree was prepared by the counsel of both parties, and made by and with their consent.   The master, instead of confining the examination to the putting out of the trust money, and the securities therefor, permitted various inquiries as to the payment of interest on the fund, and on the bond given by Isaac Jackson to John Jackson and Josiah Heritage, and also as to the various settlements made by the parties—all tending to show, not how, or when, or where the money had been put out and invested, but that it had been paid and accounted for.

What is to be the effect of these errors of the master, will be considered hereafter.   They do not necessarily vitiate the whole report.   The evidence is all reported to the court ; and if the same result is fairly attainable without the aid of the examinations, the report may be confirmed.

The master has stated an account of the interest due on the trust fund up to the first of March, 1831, and finds the amount to be eleven hundred and twenty-nine dollars and thirty-eight cents.   About this there appears to be no dispute.   He has also stated a separate account of the amount due for principal and interest on the bond given by Isaac to the executors, and states it to be thirteen hundred and eighty dollars and forty-four and a half cents, on the fourteenth of August, 1831.   This is excepted to as erroneous, by the fifth, sixth and seventh exceptions, which will now be considered.   They bring up the real matter in dispute, viz. what is due on the bond.   If more than the amount of interest due Isaac on the trust fund, then he is indebted to the executors for the difference ; if less, then the executors are indebted to him.

14

[Jackson v. Jackson's Ex'rs.]

It appears that there was in the hands of the executors, as trustees under the will of Joseph Jackson, deceased, a certain amount of trust money; part of which was for the use and benefit of Edith West, a daughter of the testator, and the residue for the benefit of Isaac Jackson, the complainant. This last was the proceeds of the sale of one half of the "Shippen place," directed by the will to be sold and invested, and amounted to two thousand three hundred and four dollars and ninety-five cents. The interest of this sum was to be applied annually to the support and maintenance of Isaac. It appears, also, that the executors made some division of the trust fund between themselves. The fund for Edith West was in the hands of Josiah Heritage; that for Isaac Jackson, which was much the larger, was considered to be in the hands of John Jackson.

In 1812, John Jackson sold and conveyed to Isaac Jackson, in fee, a tract of land of about ——— acres, for nine hundred and forty dollars and eighty-three and a half cents. No part of the money was paid, but Isaac gave his bond and a mortgage on the property to secure the payment of it. The bond and mortgage were made payable to the executors of Joseph Jackson, deceased, and not to John Jackson in his individual capacity; so that while Isaac Jackson had a claim every year against the executors, to the amount of the interest of the trust fund, they had a claim against him, at the same time, to the amount of the interest of the bond and mortgage.

It is shown that there were annual settlements between Isaac and John; and according to the testimony of Aquila Wells, the interest on the trust fund was all settled up to the spring of 1814; and he also states, that in making that settlement, the interest on the bond, though spoken of, was not taken into the account. The settlements were made in the month of March, and continued to 1824, when a dispute arose between the parties, and no further payments were afterwards made. At these settlements receipts were mutually given and taken. Those given by Isaac Jackson are all given to John Jackson, and are in full of interest to the time of their date, respectively.

[Jackson v. Jackson's Ex'rs.]

1. The first one is dated,

March, 1816, for all the interest up to that date.

2. March, 1817, received $102 52, in full of interest.

3. March, 1818, " 100 52, do.

4. March, 1819, " 105 05, do.

5. March, 1820, " 100 11, do.

6. March, 1821, " 115 88, do.

7. March, 1822, " 123 99, do.

8. March, 1823, " 131 67, do.

9. March, 1824, " 130 85, do.

The receipts given by John Jackson are endorsed on the bond held by the executors against Isaac, and are for different sums, as follows :—

1. The first is dated,

March 1, 1815, for the sum of $100 04

2. March 1, 1818, do. 46 45

3. March, 1819, do. 60 74

4. March, 1820, do. 100 11

5. March, 1821, do. 115 88

6. March, 1822, do. 123 99

7. March, 1823, do. 131 67

8. March, 1824, do. 130 85

The first, second and third of these receipts, given by John to Isaac, are expressed to be for payments "towards the principal of this bond and warrant." The remainder are simply for so much money received on the bond generally.

If the three first receipts are taken literally, and the calculation made on the principle that at each of these times the interest was liquidated, and the amount endorsed to be deducted from the principal, then the amount due on the fourteenth of August, 1831, was five hundred and twenty-nine dollars and forty-one cents. If the receipts are taken for so much money paid on the bond generally, then the amount due at that time was, as before stated, thirteen hundred and eighty dollars and forty-four and a half cents.

The master, in making his report, has placed all these pay-

ments on the same footing, and considered them as general payments. He has considered the bond and mortgage as a private transaction, entirely separate and foreign from the trust fund, and that they were made payable to the executors through ignorance or inadvertence.

After examining the whole evidence, and duly considering the reasons given by the master in support of his conclusions, my mind has been brought to an entirely different result; and I must allow the exceptions to this part of the report.

Part of the answer of the defendant, John Jackson, is in accordance with the master's report. He denies expressly any agreement that the money due on the bond should be appropriated to the payment of the interest money due from the trust fund. He avers, also, that at sundry times he paid to Isaac Jackson the interest money due him under the will, and took his receipts; but it is to be observed that the allegation is very general, and does not undertake to state in what way the payments were made. He denies that any part of the principal money was ever paid to him on the bond by Isaac Jackson. Admitting this part of the answer to be responsive to the bill, it is evidence for the defendant, and must stand until overcome in the ordinary way. Is the evidence of the complainant, in connection with the circumstances and facts of the case, sufficient to overcome it? Believing that it is, I shall state very briefly my reasons for such belief.

1. The manner in which the bond and mortgage were drawn, is a very strong circumstance to show a connection between them and the trust fund.

John sold to Isaac a piece of land, and took a bond and mortgage for the amount. Instead of making it payable to himself, individually, he directs it to be drawn payable to himself and Heritage, as executors of Joseph Jackson. This could not well have happened, without some understanding on the subject. The direction must have been given to the person who prepared the writings; and it is impossible to conceive what could have prompted it, if the transaction had been considered strictly a

private one, without reference to the trust money in the hands of John, on behalf of the executors.

The bond was made payable ten years ahead, but it is expressly stipulated that the interest shall be paid annually. This is a strong circumstance to show that Isaac was to have an opportunity of paying for the property out of the interest of the fund. It will be found by calculation, that the balance of the interest of the trust fund, after deducting from it the annual interest on the bond, would, if applied annually to the payment of the principal of the bond, have discharged it in about eight years. If any part of the balance was taken to pay Isaac's debts, as was sometimes the case, it would take longer.

2. John admits in his answer, if I understand it correctly, that this bond and mortgage was considered part of the trust fund placed in the hands of Isaac.

He says, the reason he took the obligation payable to this defendant and Heritage, as executors, was, because he had so much more of the estate in his hands than Josiah; and because so much money would then be at interest under the will, of the amount of the Shippen place ordered to be sold. If on interest, it would be on interest in the hands of Isaac Jackson himself, to whom the annual interest of the whole trust fund was payable. And is it reasonable to suppose, that John would year by year have paid to Isaac the whole annual interest on the fund, without deducting out of it the interest on that part of the fund which was in the hands of Isaac himself? The use of the money on that bond was as so much interest paid by the executors, or by John, annually to Isaac, and if the interest on the balance of the fund which was in John's hands, instead of being paid over to Isaac, was credited on his bond, it was rightly credited as principal, and not as interest. It went to extinguish the debt itself.

3. There is another circumstance connected with this part of the answer, showing the connection between the bond and mortgage and the trust fund, and that they were intended to constitute a part of it.

[Jackson v. Jackson's Ex'rs.]

John says, the bond was made payable to the executors, because he had so much more of the funds in his hands than Heritage. The idea was, that by making the bond payable to the executors, that which had been John's private property would become a part of the trust property, and subject to the control of both of them, so that Heritage would thereby be rendered more safe; and accordingly we find that John afterwards procured Heritage to give up that part of the trust fund in his hands that consisted of John's bond—for he had purchased a part of the land directed to be sold to raise this fund, and his own bond constituted a part of the fund. The bond and mortgage given by Isaac to the executors was so drawn, that it might be substituted for the bond of John in the hands of Heritage. They were not actually delivered over to Heritage, but were purposely drawn payable to the executors, that they might be viewed as a part of the trust fund out at interest; and because they were so drawn, John was enabled to get up his own individual bond, and substitute this as a part of the fund.

4. In the next place, the receipts themselves are explicit, and they are entitled to great weight. The manner in which the first three are drawn is peculiar, and it is not easy to perceive why they were thus worded, if they were not designed to mean just what they express. The money paid is expressed to be towards the principal of this bond and warrant. This is sufficiently explicit, and I have not met with any evidence or circumstances that explain it away. The defendants, in their answer, do not set up any fraud, or mistake, or inadvertence, in drawing the receipts. Two of them are in the hand-writing of John Jackson himself, and from what appears in this case of his knowledge of business, it is but just to presume he understood the difference between such a receipt and one in common form, or between principal and interest.

It is not possible, perhaps, after this lapse of time, to explain why the mode of indorsement was altered after the year 1819; but it is worthy of remark, that the payment of 1820 is so much larger than those of 1818 and 1819, as to induce the belief that

the interest then accruing is added to the usual payment of the principal; and hence the receipt is general, for so much paid on the bond, as it ought to be.

5. The testimony of David Carney is very important to show that the receipts are right as they stand, and were understood by the parties.

He states, that in the spring of 1818, he bought of Isaac Jackson the land which he had purchased of John Jackson, and agreed to give him one thousand dollars for it. The mortgage on it to the executors was to remain, and he was to give Isaac his note for the difference between the amount of the mortgage and the amount of the purchase money. He gave his note for two hundred and five dollars and sixty-five cents, on the ninth of May, 1818, and the difference between that and one thousand dollars, was what Isaac owed John on the bond and mortgage. This the witness understood from John himself. It did not come to quite eight hundred dollars. This could not be the case in the nature of things, if the two payments that were endorsed on the bond before that time be taken as general payments. The bond must have amounted to a much larger sum. But taking the indorsements as evidence of the payment of so much principal, besides the interest, and the evidence of Carney is fully corroborated. The two payments amounted to one hundred and forty-six dollars and forty-nine cents. Deducting that amount from the principal of the bond, it left a balance of seven hundred and ninety-four dollars and thirty-four and a half cents still due. Add to this balance the amount of the note given by Carney to Isaac, of two hundred and five dollars and sixty-five cents, and it makes nine hundred and ninety-nine dollars and ninety-nine and a half cents. The sum given was one thousand dollars. Carney says he afterwards gave up the place, and Isaac bought it back. It would have been more satisfactory if the note spoken of by Carney, or even the deed, had been produced. His statement would have been greatly confirmed, and would to my mind have been conclusive. As it is, the witness standing unimpeached, his statement is entitled to great consideration. He proves also a

conversation with John, about the time and manner in which John and Isaac made their settlements. John told him that he and Isaac settled every year. The interest on both sides was cast up, the one deducted from the other, and the difference was entered to the credit of Isaac on the bond. This he understood from both of them. John told him there would have been more credit on Isaac's bond, if he had not paid other debts for him. The private dealings of the parties being brought into the settlement, accounts for the difference in the amount of the receipts, and may account for the fact, that there is no indorsement on the bond for the years 1816 and 1817.

Leaving out of view all evidence, apparently of a doubtful character, that which remains, connected as it is with circumstances that cannot deceive, is much more than sufficient to overcome the answer of the defendant as to the mode of settlement. It establishes satisfactorily to my mind, that the bond was considered as a part of the trust fund, and that the settlements had reference to both. Nor is this conclusion shaken by the testimony of Aquila Wells. He says he was present at the settlement in 1814, and that the bond was not brought in; he is certain of it. Admitting this to be true, the witness himself assigns a very good reason for it. He says, that the money John had paid for Isaac amounted to almost the whole amount of the interest of the trust fund. There was a small balance, and this was paid in money, and a receipt given by Isaac to John. If it be true that John's private account against Isaac was nearly enough to meet the whole interest of the trust fund, it was natural that John should seek to be paid that first, and leave the interest standing on the mortgage, for that was secure. Hence it may well be true, as the witness states, that Isaac said the interest on his bond to John was not to be taken into the settlement *at that time.* It may be remarked, too, that John at that time requested payment of the interest on the bond, but it was not settled. And further, the witness in the first part of his examination, says expressly, there was a calculation made on *a bond*, which could have been none other than the bond in question. So that we see

the bond was talked of by both at the time. It was brought forward, and a calculation made of the interest; but the interest was not settled at that time, Isaac having no funds to pay with. All this is entirely consistent with the view now taken of the subject by the court.

I pass over the testimony of Mr. and Mrs. Hewitt. It is too equivocal to be the foundation of faith, in behalf of the complainant or the defendants.

In my opinion, the master has erred in this part of his report, in considering the bond and the trust fund as separate and unconnected; and in calculating the three first payments on the bond as general payments, instead of payments on the principal.

The fourth exception—respecting the claim and allowance of an annual commission of ten dollars for managing the trust fund, is disallowed; and solely on the ground, that the parties themselves have made their own arrangement and settlement on the subject. Were the matter considered properly open, the court would feel strongly inclined to reject the claim altogether; not for the want of any power or right to make an equitable and just compensation to trustees; but because the trustees, in this instance, have not done their duty in properly investing the trust fund committed to their care.

A question was raised as to the interest since the year 1824. I think there can be no doubt as to that point. The trustees are chargeable with the interest until the money is paid over or brought into court, and they are properly discharged from the trust.

The result is, that the first, second, third, fifth, sixth and seventh exceptions are allowed, and the fourth is disallowed.

I presume it will not be necessary to send the report back to the master. It will occasion delay, and the report may be corrected without that formality. The only question is as to the amount due on the bond, and that is easily ascertained from the statement made by the master in schedule fourth, accompanying the report.

Unless objections are interposed, the court will order the report to be corrected, so as to conform to the opinion here expressed.

I cannot close this opinion without remarking, that the course adopted by the master, of arguing the whole case upon its merits, as has been done in the report, and that too at great length, is novel, and will not, it is hoped, be considered as a precedent to be followed. The province of the master is to report facts, and not arguments, for the information of the court.